UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

-vs-

**MOHAMED FARAJ, D-1**
**ABED FARAJ, D-2**
**FOUAD FARAJ D-3**
**MOHAMED AYOUB D-7**

    Defendant.

File No. **13-20564-01**

Honorable: Stephen J. Murphy, III

## SENTENCE MEMORANDUM

### I. Background:

#### A. Judicial History:

Mohamed Faraj was charged by Indictment in this Court with four (4) felony offenses: Continuing Criminal Enterprise (18 U.S.C. § 848); Conspiracy to Possess With Intent to Distribute a Controlled Substance (21 U.S.C. §841; 846); Possession of a Firearm in Furtherance of a Drug Trafficking Crime (18 U.S.C. §922(g)); and Use of a Telecommunication Facility in Furtherance of Drug Trafficking (18 U.S.C. §843). Mr. Faraj was convicted on all of the above counts by a jury except for the weapons count, upon which the jurors were unable to return a unanimous verdict. He will be sentenced by this Court on May 1, 2015.

Defendant Faraj has filed a Motion, pursuant to F.R.Cr.P. 29, to enter a verdict of not guilty as to the Continuing Criminal Enterprise count. The government has filed an Answer in opposition and the matter is now pending before the Court.

B. **Personal History**:

Mohamed Faraj is 31 years of age, having been born in metropolitan Detroit on August 29, 1983. He grew up in principally on Gary St. in the Lonyo/Wyoming area of Dearborn, Michigan, where his mother, Karige, still resides. He was one of 11 children who grew up in "genteel poverty". His father was addicted to crack cocaine and did not support his family economically or morally. Mohamed attended Fordson High School, but did not graduate, though he earned a GED in 2004.

While still enrolled in grade school, he had the misfortune of meeting a fellow student named Hafez Hammoud. While Mohamed Faraj has been most candid about admitting his partial guilt in the crimes he was charged with, he was always certain to point out than in comparison with himself, Hammoud was many times worse. He has and continues to describe Mr. Hammoud as a pathological liar, a sneak thief, a sexual degenerate, serious drug addict, and a person not to be trusted even in the most casual matters of daily life. These allegations are significant, if for no other reason, because Hafez Hammoud was the government's chief (though admittedly not only) witness against Mohamed during the instant trial.

Mr. Faraj has not yet been married, however he had a significant relationship

with Fatina Alhisnawi, who is the mother of their children, Dany and Zeinab. According to the Presentence Report in this case, Mr. Faraj's "detention has had an 'overwhelming' impact on his son as they share a very close relationship." (PSR p. 19, par. 68). (See attached letter from Mohamad's brother).

The above report shows a very limited work history for Mr. Faraj, consisting only in employment with his brother's computer store, One Stop Computers, in Dearborn Heights, Michigan. Mr. Faraj, however, has informed counsel about working in pizza stores and casual employment at a Johnny Rocket hamburger emporium.

There is no dispute that Mohamed Faraj had several criminal convictions, however the majority of his confrontations with the criminal justice system centered around traffic offenses and relatively minor drug convictions. His involvement is generally longer than it is serious, although no one will assert that motor vehicle manslaughter is not serious. The fact that he is accessed a criminal history category of "VI" more than adequately sums up what his past will now cost him, in terms of sentence guidelines.

Proofs elicited at trial in this cause demonstrated that Mohamed Faraj's older brother Danny some years ago became involved in illegal drug sales in the family's neighborhood of Dearborn/Southwest Detroit. Danny, who was not an American citizen, was arrested, convicted and deported from this country and finally made his

3

home in South America. Much of his brother's problems occurred while Mohamed was doing jail time for his motor vehicle legal problems.

Eventually Mohamed Faraj, by his own admission, became involved in the small-scale sale of marijuana in the Warrendale area of Southwest Detroit. The more believable evidence, that is the evidence which did not depend on the thoroughly unreliable word of government witnesses who were themselves drug dealers with testimony-for-hire, showed that Mohamed sold relatively small amounts of a high-grade strain of marijuana, called "kush", in the neighborhood. This was freely admitted by the defense. What was denied, and properly so, was that Mohamed Faraj was a long time, kilo quantity, kingpin of the narcotic trade beyond his own neighborhood. The government attempted to portray him as a drug lord who ruled a fairly vast empire which reaped grand amounts of cash. The facts spoke otherwise. No witness was able to deny these simple facts: 1) Mohamed Faraj never even owned a new car; 2) Faraj never owned his own home- -mostly he lived in a house with his older brother, Abed; 3) Mr. Faraj at the time of his arrest possessed no cash hoard or even a bank account; 4) he was never been known to have so much as taken a vacation all during the period when the government charged that he was living high. The proceeds of his "empire" apparently consisted of some items of expensive men's clothing- - not the stuff drug czars are seen to possess.

Mohamed Faraj has now been convicted of three of the four charges against

him and he awaits, admittedly with trepidation, the sentence of this Court.

II. **Sentencing Considerations**:

The Federal Sentencing guideline structure is generally set out in the factors enumerated in 18 U.S.C. §3553(a). The courts have interpreted the language of the Sentencing Reform Act of 1984 to *mandate* that a sentencing court has a statutory duty to fashion a sentence that is "sufficient, but not greater than necessary," to comply with the criteria of the Sentencing Reform Act. *United States v. Kinbrough*, 128 S. Ct. 558, 570 (2007); *United States v. Collingwood*, 461 F. 3d 805, 806 (6th Cir. 2006); *United States v. Foreman*, 436 F.3d 638, 644 N. 1 (6th Cir. 2006), ("it is worth nothing that a district court's job is not to impose a 'reasonable sentence'. Rather a district court's mandate is to impose 'a sentence sufficient but not greater than necessary to comply with the purposes of §3553(a)(2)'")  In determining the particular sentence to be imposed, [the court] shall consider:

1. The nature and circumstances of the offense and the history and characteristics of the defendant.
2. The need for the sentence imposed—
   A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
   B. to afford adequate sentence to criminal conduct;
   C. to protect the public from further crimes of the defendant; and

5

    D. to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3. The kinds of sentences available.

4. The kinds of sentences and the sentencing range established [by the Sentencing Commission]…

5. Any pertinent policy statement issued by the Sentencing Commission…

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7. The need to provide restitution to any victim of the offense.

18 U.S.C. §3553(a).

The starting point of this analysis should always be the sentence prescribed by the United States Sentencing Commission Guidelines ("U.S.S.G." or "the Guidelines"). *Gall v. United States, 128 S.Ct. 586,596 (2007)* ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range") (citing *Rita v. United States, 127 S. Ct. 2456, 2480 (2007)*). However, the court may not limit its analysis to the Guidelines; indeed, it "may not presume that the Guidelines range is reasonable," *Gall, supra at 596*. Rather, before

rendering its decision, the court must consider all the factors enumerated in 18 U.S.C. §3553(a) to impose the minimum sentence necessary to achieve the goals of sentencing. *United States v. Booker*, 543 U.S. 220, 245-46 (2005); *Rita, supra*, at 2465. In fact, §3553(a) permits the courts the freedom to impose a sentence that substantially deviates from the advisory Guidelines range "based solely on policy considerations, including disagreement with the Guidelines." *Kimbrough, supra* at 570. In doing so, the court must consider any argument made by the defendant to reduce his or her sentence:

> When a defendant raises a particular argument in seeking a lower sentence, the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it. After considering such arguments, the district judge cannot simply rely upon the advisory Guidelines range, but rather "must make an individualized assessment based on the facts presented." Finally, the district judge "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*Unites States v. Lalonde*, 509 F.3d 750, 770 (6th Cir. 2007) (quoting *Gall, supra* at 597) (other quotations omitted).

In short, the Court should consider arguments that the guidelines should not apply on general policy grounds, case-specific grounds (including guideline-sanctioned departures) or "regardless." *Rita, supra,* at 2463-68.

### III. Application

#### A. The Sentencing Guidelines and Any Pertinent Policy Statement pursuant to 18 U.S.C. §3553(a)(4).

7

Since the sentencing guidelines are not presumed reasonable (*Gall, supra*, *Nelson v. United States*, 555 U.S. 350 (2009) (per curiam)), the sentencing court may determine that the applicable guideline range fails to properly reflect the factors set forth in *§3553(a) and*, the court "may vary . . . based solely on policy considerations, including disagreements with the Guidelines" (*Kimbrough. supra,; Spears v. United States*, 550 U.S. 261, 263-267 (2009).

### B. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The offense of maintaining a continuing criminal enterprise is, without question, a very serious offense and Congress has recognized that fact by providing what may be characterized as "Draconian" penalties for conviction of this crime. However, Mohamed Faraj has never acquiesced to guilt of this charge. He asked this Court to enter a judgment of acquittal pursuant to F.R.Cr. P. 29 at the close of the government's case and again after the verdict. That motion is now pending in this Court. Mr. Faraj, through counsel, feels it would be inappropriate to ask the Court for any kind of mitigation of punishment for a crime he did not commit.

As to the crimes he more or less acknowledges, the conspiracy to deliver and the use of a phone in such a conspiracy, Faraj urges the Court to consider leniency, taking into account the true facts: that this was not an extensive conspiracy, (defendant was convicted specifically by the jury of being responsible for less than

8

100 kilograms of marijuana) and as to the use of communication devices, they were not widespread nor particularly integral to the sales demonstrated in the government's case.

### C. Character of the Defendant

In assessing the character of Mohamed Faraj, the testimony of even some of the government's chief witnesses belies the idea that he was violent, mean, sadistic or even particularly corrupt, especially when compared to the likes of other government witnesses, themselves, such as Hafez Hammoud, Mohamed Alkahami, Ali Al-Hasnawi, Adan Bazzi or the infamous, paid for informant, Kito Perkins. The real character of Mohamed Faraj was probably best portrayed by government witness, Sharif Sayed. Sayed was admittedly a frequent user of marijuana, who helped several friends and neighbors distribute pot in Warrendale. He graphically described the violent tendencies of some of the government's prize witnesses such as Hafez Hammoud and Mohamad Alkahami (a/k/a "AK" [47?]) Mr. Sayed testified unequivocally that Mohamed Faraj *never* used or possessed a firearm during the time of the conspiracy. Also, it was Sayed who destroyed the government assertion that Mohamed had anything to do with the vicious, unprovoked acts of sadistic violence perpetrated by Hafez Hammoud against the defenseless Hammoud Harajli. Those acts were the inspiration of Hafez Hammoud; carried out by Hafez Hammoud for the sole entertainment of Hafez Hammoud. Faraj, on the other hand

was Harajli's friend and protector. Sayed further belied the overstated amounts of drugs that were being sold during the conspiracy. Of significant importance to the whole government case, Sharif Sayed stated that the somewhat distinctive vials that the government contended were the trademark of the Faraj group were, in fact, not exclusive to those sellers, but were as used as well by rival, competing organizations of dealers in the general neighborhood.

Sayed's testimony was often in stark contrast to that of Mohamed Alkahami and Hafez Hammoud. Mohamed Faraj is hopeful that the Court will remember the less than subtle differences in appearance, demeanor and consistency in contrasting the truthfulness or lack thereof among the three witnesses. Even just one example is helpful. Alkahami so distorted his testimony in order to put a gun in Mohamed Faraj's hand that he simply invented a scenario (unknown to all other witnesses) involving a purple Jeep in the alleyway behind Rutherford, wherein Mohamed allegedly had a full-scale gunfight. This was, more than incidentally, in an alley, according to pictures admitted in evidence, where no car could penetrate. On the whole Mohamed Faraj, whereas certainly not a candidate for sainthood, was also not the reincarnation of Satan contended by the government.

> **D. The Need For The Sentence Imposed To Reflect The Seriousness Of The Offense, To Provide Respect For The Law, And To Provide Just Punishment For The Offense, Deter The Defendant And Others, To Protect The Public, And Provide The Defendant With Needed Rehabilitative Treatments In An Effective Manner.**

Mohamed Faraj is not so naïve as to believe that his sentence in this cause will be anything other than a relatively substantial prison term. "Relatively" here is the operative word as will be discussed in subsection F, below. If the Court is persuaded by the collection of miscreants presented by the government herein to needlessly inflate the amount of drugs that Mr. Faraj was responsible for, the sentence might be significant—but would it be warranted? Faraj argues "no". Yes, he sold marijuana in non-substantial amounts in a limited neighborhood *and* he never denied it. Some mitigation should be found in his honesty.

### E. The Kind of Sentence Available.

The guideline sentence range for Mohamed Faraj, as calculated (over certain objections) at 360 months to life, is a wide open option for the Court, while still being questionable under the circumstances. Thankfully, those guidelines are merely advisory under *Booker v. United States*, 543 U.S. 220 (2005). The Court should not limit its analysis to those guidelines; indeed, it "may not presume the guideline range is reasonable." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). Before rendering its decision, the court must consider all the factors enumerated in 18 U.S.C. §3553(a) to impose the minimum sentence necessary to achieve the goals of sentencing. Hopefully the operative word here is "minimum". When Congress set a mandatory minimum sentence for Continuing Criminal Enterprise, it is a fair argument that they weren't thinking about the "nickel/dime" criminal adventure in

11

the Warrendale, Michigan area in 2011. A court must consider all argument made by the defendant to reduce her or his sentence. See *Lalonde, supra.*

The above discussion becomes all the more relevant considering the fact that the Court is unable to deviate from most unfair mandatory minimum sentence of 20 years for continuing criminal enterprise. Unless, of course, the Court is rightfully persuaded, per Mr. Faraj's Rule 29 motion, that the above charge should be dismissed.

### F. The Need To Avoid Unwarranted Disparity

Disparity in this case may be viewed comparatively as between the punishment meted out to defendant Mohamed Faraj vis-a-vis those co-defendants with whom he was charged; it may also be by comparison with the government's witnesses at trial. In either view Mr. Faraj argues that this perspective militates toward comparative leniency.

Here the presentence report is somewhat deficient in information. The disposition as to Sharif Sayed is not referred to nor is that of Hafez Hammoud. There is no discernible reason that Mohamed Faraj should receive a greater amount of incarceration than the government turncoat witness, Hafez Hammoud. (Of course, defendant realizes that because of mandatory minimum sentencing and the government's unseemly embrace of Mr. Hammoud, a great discrepancy of sentence

is inevitable). Mr. Hammoud was a serial criminal, a liar, a person who would threaten a police officer (by phone in the middle of the night, in the officer's own home) nastily ("What's up, pimp? I know where you live."). He was a drug addict, a man who lied to Judge Talon on the record, a man who, not satisfied with breaking the left hand of a helpless cripple, returned the next day to break the right. If the government believes that this person, who has no regard for the law or the truth, should rightly escape his criminal escapade with a mere slap to the cheek, while Mr. Faraj does one day more than 20 years, then the government is wrong.

One last thought on sentence disparity may be appropriate here, namely the fate of government witness Kito Perkins. Although one would have considered the proposition unlikely, it is possible that in Kito Perkins the government found an even lower cretin than Hafez Hammoud. A true career criminal, Perkins told the jury an outlandish series of lies about a supposed conversation he had with Mr. Faraj in the Dickerson facility of the Wayne County Jail. Perkins sold his lies to the government for a hoped for leniency that the government will now wish to deny to Faraj, who at least had the decency not to besmirch the honor of the oath in testimony. Yet, under the system before us, Mohamed Faraj will be judged in this world far more harshly than Kito Perkins. This situation has difficulty in passing the proverbial "smell test".

IV. **SUMARY OF ARGUMENT**

Mohamed Faraj comes before the Court for sentencing with some obvious

blemishes, none of which he seeks to hide. He does have a past criminal record; he did sell user amounts of drugs in his neighborhood; he did surround himself, or allow himself to be surrounded by, unsavory characters (all too many of whom came back to haunt him in the guise of government witnesses). Mr. Faraj is also all-to-painfully aware that he faces an extremely heavy sentence for one offense (CCE) (unless this Court grants his motion pursuant to F.R.Cr.P. 29). Based on the arguments put forward in this memorandum and the myriad of facts known to the Court, some of which were not argued herein, defendant Mohamed Faraj asks for a reasonable sentence, not to exceed the necessary mandatory minimum, should it apply.

Respectfully submitted,

/s/*James C. Howarth*
**JAMES C. HOWARTH (P15179)**
Attorney for Defendant
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone: (313) 963-1455
Fax: (313) 961-4315
E-Mail: james-howarth@att.net

Dated: April 20, 2015

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

    Plaintiff,

-vs-

File No. **13-20564-01**

Honorable: Stephen J. Murphy, III

**MOHAMED FARAJ, D-1**
**ABED FARAJ, D-2**
**FOUAD FARAJ D-3**
**MOHAMED AYOUB D-7**
    Defendant.

---

CERTIFICATE OF SERVICE

I, JAMES C. HOWARTH, hereby certify that on the 21st day of April 2015, I electronically filed Defendant Mohamed Faraj's Sentence Memorandum with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Hon. Stephen J. Murphy, III, Assistant U.S. Attorney Christopher Graveline and attorneys of record.

Respectfully submitted,

**/s/ JAMES C. HOWARTH**
Attorney for Defendant
615 Griswold, Suite 820
Detroit, Michigan 48226
Phone: (313) 963-1455
Fax: (313) 961-4315
James-howarth@att.net

Dated: April 21, 2015